UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEARHAMEL JORDAN FANARO,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF CONTRA COSTA, et al.,<br><br>Defendants. | Case No. 3:19-cv-03247-WHO<br><br>**SUPPLEMENTAL ORDER ON SANCTIONS**<br><br>Re: Dkt. No. 132 |

**INTRODUCTION**

Three days ago, I entered an order regarding plaintiff Jearhamel Fanaro's motion for sanctions arising from the deposition of pro se defendant Thomas Leon, who is currently incarcerated in Pelican Bay State Prison ("Pelican Bay"), a facility administered by the California Department of Corrections and Rehabilitation ("CDCR"). Order on Motions for Sanctions ("Prior Order") [Dkt. No. 148]. At that deposition, Leon invoked his Fifth Amendment privilege against self-incrimination in response to every question. Eventually, the deposition was cut short when a correctional officer suggested Leon could end the deposition after half-an-hour and Leon did so. Fanaro moved to sanction Leon and CDCR for interfering with the deposition. *See* Motion for Sanctions Against CDCR and Thomas Leon ("Mot.") [Dkt. No. 132].

I declined to assess monetary sanctions against Leon because he was attempting, however improperly, to invoke his Fifth Amendment privilege and because I crafted an alternative remedy that would permit Fanaro to use those invocations against him at trial and prevent him from testifying in his defense. *See* Prior Order at 6–8. I had not reviewed the video of the deposition but I relied on the transcript of it and trusted in the credibility of the representations of the California Attorney General's Office; I did not want to delay a ruling in a case going to trial in six

months. I declined to sanction CDCR because it was ultimately Leon's choice to improperly terminate the deposition and because Fanaro's attorney's fees and costs from the deposition were not wasted in light of the remedy given in the Prior Order. *Id.* 8–9. But the video has now arrived and after review, it is apparent that the correctional officer's conduct during the deposition was improper, that his declaration was false, and that CDCR's representations to me in opposing the motion for sanctions were, at best, misleading.

This Order supplements and partially supersedes the Prior Order. *See City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 889 (9th Cir. 2001). It puts the behavior of Pelican Bay correctional officer Joshua Rush on record. It expresses my deep disappointment in CDCR and the California Attorney General's Office: Their briefing has diminished the confidence that I had in them. Rush and CDCR "impede[d]" and "frustrate[d]" Leon's court-ordered deposition, Fed. R. Civ. P. 30(d)(2), by suggesting how Leon could unilaterally terminate the deposition, assisting him in doing so, and giving a pretextual justification for their actions. Accordingly, I will sanction CDCR $500 to partially compensate Fanaro.

**BACKGROUND**

As relevant here, Fanaro alleges that, when he was confined at the Martinez Detention Facility, a group of defendants including Leon assaulted him. *See, e.g.*, Third Amended Complaint [Dkt. No. 94] ¶ 50. Because Leon is currently incarcerated, Fanaro moved for leave to depose him under Federal Rule of Civil Procedure ("FRCP") 30(a)(2)(B). Dkt. No. 92. No party opposed the motion and Pelican Bay indicated it could facilitate the deposition. I granted leave to depose Leon, ordered Pelican Bay to make him available, and ordered Leon to participate to the extent required by law. Dkt. No. 110. The deposition occurred virtually on December 9, 2020. It was attended by Leon; Fanaro's counsel, Qiana Washington; counsel for various defendants; and correctional officer and Pelican Bay litigation coordinator Joshua Rush. *See* Prior Order 3.

As soon as Washington asked her first questions, Leon stated that he would invoke his Fifth Amendment privilege against self-incrimination. *See* Certified Copy of Transcript of Leon's

Deposition ("Trans.") at 20:6–9.[1] He repeatedly made it clear that he would be doing so in answer to every question. *See, e.g.*, *id.* at 18:21–23; 21:2–5; 21:11–12. Washington attempted various paths to get him to answer, including asking him questions that could not arguably incriminate him. *See, e.g.*, *id.* at 30:15–16 ("How do you think that refusing to answer your name is going to incriminate you?"); *see also* Prior Order 8 (discussing methods of trying to get responses that raised concerns about attorneys interacting with unrepresented persons). But Leon was firm that he would answer no questions.

Most of the remainder of the deposition consists either of Washington attempting to convince Leon to answer or explain his concerns, or of her asking questions and him refusing to answer by "plead[ing] the Fifth." Several other moments bear mention. First, after Leon repeatedly said he would be invoking the Fifth Amendment, he said, "[f]uck." Trans. at 24:18. According to a sworn declaration submitted by Rush, Leon "yelled" the expletive "as he grew increasing [sic] angry with the questions posed to him." *See* Third Party CDCR's Opposition to the Mot. ("Oppo.") [Dkt. No. 138] at 13 ¶ 5. In his Reply, Fanaro stated that the word was not yelled but said under Leon's breath, though there was no sworn statement supporting that assertion. *See* Prior Order 3 (citing Reply in Support of Leon Mot. [Dkt. No. 143] 9). The video is clear: Leon says the word at the same or a lower volume as any other statement and as an annoyed aside to himself. *See* Video of Deposition of Leon ("Video") (notice of receipt between Dkt. Nos. 147 and 148, entered April 1, 2021) at 10:58–11:01.

After some back-and-forth over whether he could invoke the privilege, and after he continued to "plead the Fifth" in response to every question, Leon asked to be taken to his cell and Rush said that was "up to the counsel." Trans. at 27:21. Washington made clear that she would not terminate the deposition. *Id.* at 27:24–28:4. The deposition transcript then reflects Rush saying, "[d]on't let her get to you." *Id.* at 28:5. The video of the deposition depicts Rush *whispering* this from off-camera to Leon; Leon looking to where Rush presumably was; Rush

---

[1] The transcript of the deposition is before me as plaintiff's exhibit 1, appended to his motion. It begins at ECF page 12 of Dkt. No. 132. Citations for all exhibits are to the ECF-generated page number.

reiterating in a whisper, "[d]on't let her get to you"; and Leon giving a subtle acknowledgement with his head. *See* Video at 16:10–16:16.

The deposition continued with Washington asking questions and Leon invoking the privilege, including in response to questions such as his name. *See* Trans. at 30:13–14. From the interaction with Rush onward, the video shows that Leon is calm. He simply answers the questions put to him by invoking the privilege. Approximately twenty-seven minutes into the deposition, Washington asks whether he had been informed he would be criminally prosecuted and Leon responded, "I pleaded the fifth" in an even tone as he had to the preceding questions. *See id.* at 33:3–5; Video at 27:07–27:16. Seconds later, Rush stated, "[i]f you want to go, tell us loudly, and we'll take you back." Trans. at 33:6–7. The video depicts Rush against whispering this from off-camera. Video at 27:19–27:30. What the transcript does not capture is that Rush actually said this statement twice and Leon softly asked, "hmmm?" after the first one, causing Rush to repeat it. *Id.* The court reporter interjected to ask the speaker to identify themselves. Trans. at 33:13. Rush identified himself and stated, "I was talking to my partner." *Id.* at 33:11–12. Leon then asked to be taken back to his cell and Rush said they would "take [him] back." *Id.* at 33:15–16.

Without further prompting, Rush stated, "[w]e can't force him to stay, and we are not going to use force to keep him here. So at this time, we are going to terminate the deposition for the safety of our staff." Trans. 33:17–20. Washington urged him not to, or at least to contact the Attorney General's Office before doing so. *Id.* 33:21–34:21. As I described it in the Prior Order,

> After some cross-talk between Washington and Rush, Rush reiterated, "we are not going to use force to keep him here," and Washington replied "[n]o one is using any force. No one is asking you to use force. He is sitting –." *Id*. at 34:1–4. Rush interjected with, "I understand that, but we are going to take him back to his cell." *Id.* at 5–6. There was some discussion about whether Pelican Bay had spoken to the Attorney General's Office about the issue. Washington also stated, "[a]nd just for the record, we do have you on the record telling Mr. Leon to say he wants to go back to his cell. The court reporter –." *Id.* at 35:7–9. Rush and Leon interrupted with Leon saying, "I already asked," and Rush saying, "[h]e kept saying that." *Id.* at 10–12. Washington responded, "I heard you say it, and the court reporter heard you say it as well." *Id.* at 13–14. Leon was removed.
>
> After his removal, Washington stated, "[o]kay. So I am going to make a statement for the record about what just happened. Obviously we have Mr. Rush on the record prompting

4

the witness to, I guess, 'If you want to go, tell us loudly, and we'll take you back.' And then when the court reporter asked him to speak up, he falsely claimed that he was talking to his partner." *Id.* at 36:8–15. She also said, "[n]o one was asking him to use any kind of physical force although he kept claiming they can't physically force him. Nobody asked him to physically force him to do anything, but certainly he was required to sit and answer whatever questions that we posed to him." *Id.* at 16–25. She also asked if anyone else had something to add for the record, and all replied that they did not. *Id.* at 37:3–4. Prior Order 4.

In addition to its mischaracterization of Leon's expletive, Rush's declaration states that Leon "grew increasing [sic] agitated and angry with Ms. Washington's questions." Oppo. at 13 first ¶ 5. He also avers that, "[g]iven my 19 years of correctional experience, keeping Mr. Leon locked in a room posed a security threat because he could have taken out his anger on correctional officers for keeping him in the room or damaged equipment in the deposition room." *Id.* at 13 second ¶ 5. He stated that he "asked Mr. Leon to clarify if he still wanted to return to his cell" to "diffuse" the "volatile" situation and "respect Mr. Leon's rights." *Id.*

On March 3, 2021, Fanaro moved to sanction Leon and CDCR for interfering with the deposition. CDCR responded; Leon did not.

As relevant here, the Prior Order declined to assess monetary sanctions against Leon. As I explained, "[h]e appeared for his deposition; Rule 37 sanctions based on a failure to appear are inappropriate. Leon, moreover, is pro se and attempted to assert his privilege against self-incrimination under the Fifth Amendment. Lacking counsel, he likely was unaware of his obligation to respond to every question, whether or not he intended to assert his right against self-incrimination to every question." Prior Order 6. His blanket assertions, I pointed out, were improper under Fifth Amendment law. *Id.* But I nonetheless did not sanction him because "[i]n civil cases, there is an established consequence that comes from asserting the Fifth Amendment: an adverse inference at trial because of the failure to testify. *See S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998). Leon should be aware that his refusal to give answers in his deposition means that he will not be able to give testimony in his defense at trial." *Id.* 7 (emphasis removed). And I permitted Fanaro to submit a list of the questions he would have asked and ordered Leon to make clear that he was asserting the privilege as to each. *Id.*

The Prior Order also did not sanction CDCR. I pointed out that "[i]t was Leon's decision,

5

not CDCR's, to improperly terminate the deposition." *Id.* 8. I also said, however, that "[s]ome of CDCR's asserted justifications are not entirely supported by the transcript (as just one example, Rush stated that he had been speaking to his partner when he suggested that Leon terminate the deposition, while the transcript reflects that he suggested to Leon that he could loudly ask to return to his cell . . .)." But I did not shift the costs of the deposition to CDCR "because I am giving Fanaro the opportunity to put the questions to Leon, [so] his attorney's fees and costs were not wasted." *Id.* 8–9.

A DVD of the video of the deposition submitted by Fanaro as an exhibit to his motion was processed through the Court's mailroom on April 1, 2021.

## LEGAL STANDARD

"The court may impose an appropriate sanction—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). As a form of discovery sanction, the district court has broad discretion to determine the appropriate sanction. *See Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976) (citing authorities).

## DISCUSSION

As an initial matter, and as the Prior Order held, Leon's deposition was terminated improperly. Termination of a court-ordered deposition may only be done by court order. *See* Fed. R. Civ. P. 30(d)(3); Prior Order 8–9.[2] Of course, exigent circumstances can justify pausing the deposition or adjourning it to a future time, but I explain below why those circumstances did not conceivably exist here. Even if they did, the proper response would not be cancelling the deposition entirely, it would be postponing until the exigency passed.

CDCR does not dispute that I have the *authority* under the FRCP to sanction it for Rush's conduct. Its argument is instead that the conduct was proper or, at least, not sanctionable because Rush did not "impede[], delay[], or frustrate[]" Leon's deposition. *See* Oppo. 4–7.

The video of the deposition has revealed three key aspects of what occurred that could not

---

[2] CDCR incorrectly argues that Leon had "right" to terminate the deposition under FRCP 30(d)(3)(A). Oppo. 5–6.

1   have been conclusively determined from the transcript alone and that show why sanctions are
2   warranted.

3       First, the video shows that Rush's statement—in a sworn declaration, no less—that Leon
4   "yelled" the expletive is false.  The video lays bare that the word was said as an aside; it was not
5   "yelled" or even spoken in a meaningfully different volume than anything else Leon said.  Video
6   at 10:58–11:01.  CDCR's brief, signed by Michael Lagrama of the California Attorney General's
7   Office, not only repeats this false statement, it builds it into a cornerstone of its argument.  CDCR
8   argues that Leon become increasingly angry and "got so mad he yelled, 'Fuck!'"  Oppo. 6.  It goes
9   on to argue that Rush "*therefore* concluded that forcing Mr. Leon to remain in the deposition room
10  posed a security threat."  *Id.* (emphasis added).  As noted, the video shows that this argument is
11  factually incorrect and misleading.  Further, the expletive was uttered more than fifteen minutes
12  prior to when Leon was removed from the deposition.  *Compare* Video 10:56–11:01 (expletive
13  used), *with* 33:15–16 (Rush approves Leon's removal).  The alleged connection between them is
14  entirely an invention of the brief.  (And no exclamation point appears in the transcript; CDCR's
15  misleading embellishment is not well-taken.)

16      Next, the Prior Order noted, "Rush stated that he had been speaking to his partner when he
17  suggested that Leon terminate the deposition, while the transcript reflects that he suggested to
18  Leon that he could loudly ask to return to his cell."  Prior Order 8–9.  In the video, Rush not only
19  says this, he says it twice so that Leon could adequately hear it.  Video at 27:19–27:30.  Leon
20  acknowledges it and immediately asks to be taken away.  *Id.* at 27:25–50.  While, as I previously
21  found, it was ultimately "Leon's decision . . . to improperly terminate the deposition," Prior Order
22  8, Rush's statement was the impetus for it.  If Leon wished to (however improperly) assert his
23  Fifth Amendment privilege, he had to sit through every question and do so on a question-by-
24  question basis.  *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1263 (9th Cir. 2000).

25      Rush suggesting to Leon that he could unilaterally terminate the deposition after roughly
26  thirty minutes "impede[d]" and "frustrate[d]" the deposition.  Fed. R. Civ. P. 30(d)(2).  There is
27  every reason to think that, had Rush not intervened, the deposition would have continued as it had,
28  with Leon pleading the Fifth to every question.  That is proper; it is more than an empty formality

because it would permit Fanaro to argue for adverse inferences to be drawn at trial and for Leon to be barred from testifying in his defense. *Colello*, 139 F.3d at 677. Leon could not return to his cell on his own, he needed Rush's cooperation. Rush's unprompted, whispered suggestions were both the catalyst for Leon's request and gave him the knowledge that his request would be successful.[3]

Finally and most importantly, the video shows that CDCR's justification for Rush's behavior—that Leon became angry and volatile—was pretextual and misleading. I have already addressed why Leon's lone expletive was both not "yelled" and was unconnected from his removal. Without that support, CDCR and Rush's argument boils down to assertions that Leon became "increasingly agitated and angry." Oppo. 3, 6; *see also id.* at 13 second ¶ 5 (Rush declaration). As noted, the transcript reflects that, from about fifteen minutes onward, the deposition was essentially a back-and-forth between Washington and Leon in which he invoked the Fifth Amendment privilege in response to each question. It would be possible that he did so in a manner that was aggressive, angry, agitated, or volatile without it appearing on the transcript. The video makes clear, however, that he did not. Instead, for many minutes leading up to Leon's removal, Washington calmly and evenly asked him questions and he calmly and evenly "plead[ed] the Fifth." Further, before Rush's interjection there is no indication of any alarm or worry, nor even a suggestion to Leon to (for instance) remain calm. And it strains credulity that a response to such aggression or volatility would be a whispered, furtive suggestion to *ask* to be taken back that was quickly complied with.

To be sure, there were times when Leon displayed some annoyance at being questioned. But those few times were largely in the first half of the deposition when he was originally told he had to sit for questioning. For many minutes leading up to his removal, he did not invoke the Fifth Amendment in a manner than could, even in the best light for CDCR, be described as "angry."[4]

---

[3] Rush's earlier whispered "[d]on't let her get to you," Trans. at 28:5, was also improper. Correctional officers may not intervene to help or harm a party's deposition performance.

[4] Moreover, the annoyance that he displayed earlier—which is temporally disconnected from Rush's intervention and Leon's removal in any event—was not particularly strong.

8

Rush's interjection occurred after a question by Washington that was just as calm as the many that came before. And notably, Leon's subsequent request to leave was said in an entirely calm tone. *See* Video at 27:30–27:50. Even if there had been an actual exigency, the correct response is not to cancel the deposition entirely, it is to work with counsel to postpone it to a time when the exigency has passed.

CDCR is correct that courts often accord prison officials some deference in matters of penal security and safety, *see Bell v. Wolfish*, 441 U.S. 520 (1979), and that is what I gave in the Prior Order. But this is not a situation in which Rush alleges there was some sign that he, with many years of experience, was able to perceive that anyone else reviewing the video could not or that called for the application of policy discretion. Instead, he misled the Court in a declaration based on *factual* mischaracterizations and falsehoods. CDCR's convolutions of the record to support its argument further betray the baselessness of these assertions. Additionally, Rush's false statement in the moment about "speaking to his partner" by itself undermines his credibility even without his other false and misleading statements.

As a fallback, CDCR and Rush argue that they were safeguarding Leon's Fifth Amendment rights. Oppo. 5–6. That is absurd. Leon had to sit through each individual question and invoke the privilege as to each. The remedy for assertion of Fifth Amendment rights in a civil case is not to simply cancel a deposition after the first series of questions, as I trust the Attorney General's Office is aware. Relatedly, CDCR argues that Rush was simply honoring Leon's previous requests to leave. *Id.* 6–7. That is not credible; the last such request occurred at least ten minutes before Rush interjected out of nowhere that Leon could request to return to his cell. And even if it were credible, Leon could not unilaterally end the deposition and Rush could not do so in his stead.

The video makes it clear that Rush's actions impeded and frustrated the deposition for the reasons explained above. I will therefore SANCTION CDCR $500 under FRCP 30 to partially compensate Fanaro for his fees and costs in preparing for and attending the deposition. Because those fees and costs were not entirely wasted, and Leon is primarily responsible, I assess a relatively small sanction. Rush and CDCR are admonished for the conduct during the deposition

9

and false sworn statement after.  The Attorney General's Office is admonished for contorting the record and misleading the Court.

## CONCLUSION

The Prior Order is PARTIALLY SUPERSEDED and the California Department of Corrections and Rehabilitation is SANCTIONED $500 to compensate Fanaro for attorney's fees and costs.  It shall pay Ms. Washington, Fanaro's counsel, within thirty days of this Order.

**IT IS SO ORDERED.**

Dated: April 2, 2021



William H. Orrick
United States District Judge