UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEARHAMEL JORDAN FANARO, | Case No. 3:19-cv-03247-WHO |
| Plaintiff, | |
| v. | **ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |
| COUNTY OF CONTRA COSTA, et al., | Re: Dkt. Nos. 144, 146, 149, 150, 155, 158 |
| Defendants. | |

## INTRODUCTION

Plaintiff Jearhamel Fanaro was brutally assaulted by other inmates when he was incarcerated at the Martinez Detention Facility ("MDF"), which is administered by defendant Contra Costa County Sheriff's Office ("the Sheriff's Office"). As relevant here, he sued Contra Costa County ("the County"), the Sheriff's Office, four Sheriff's Office officials (the "Supervisor Defendants"), and four Sheriff's Office deputies stationed at MDF for violations of the Eighth Amendment and California law. The County, Sheriff's Office, Sheriff's Office officials, and the two deputies who were not on duty during the attack (collectively, the "County Defendants") move for summary judgment. Separately, the deputies on duty during the attack, Omar De Leon and Antonio Rosas (collectively the "Deputy Defendants"), move for summary judgment.

Both motions are granted in part and denied in part. Summary judgment is granted on all claims against Christopher Burnthorne and Brandon Arata, the deputies not on duty during the attack, and all claims against the Supervisor Defendants. It is also granted on Fanaro's claims for failure-to-train, state-created danger, state-law conspiracy, state-law aiding and abetting, state-law battery, state-law assault, and state-law intentional infliction of emotional distress ("IIED") against all moving defendants.

Summary judgment is otherwise denied because there are material facts in dispute on Fanaro's Eighth Amendment failure-to-protect and state-law negligence claims against the Deputy Defendants and his remaining Eighth Amendment *Monell* claims against the Sheriff's Office and County. This Order does not rule on the claims against the inmate defendants who are alleged to have carried out the attack and have not moved for summary judgment.

## BACKGROUND

## I. FACTUAL BACKGROUND[1]

MDF is a jail in Martinez, California, run by the County. The jail falls within the Custody Services Bureau ("CSB") of the Sheriff's Office. *See, e.g.*, Deposition of Matthew Schuler ("Schuler Depo") [Dkt. No. 146-5] at 20:21–24.[2]

The Norteños are a "street gang" associated with, among other things, violent crimes and drug and human trafficking. Dkt. No. 156-5 at 18:5–25. It has a sizeable presence in MDF. *Id.* Prior to summer 2011, Norteños were housed with other inmates at MDF. *See* Schuler Depo. at 20:5–24; Deposition of Scott Wooden ("Wooden Depo.") [Dkt. No. 145-17] at 6–12. Because of attacks by Norteños on other inmates and the threat of retaliation by white gang members, CSB decided to move all Norteños into one MDF module, "A Module." *See* Schuler Depo. at 20:25–21:9. Since then, Sheriff's Office officials have examined the possibility of reintegrating Norteño inmates but believed that the risk of violence was too high. *See* Wooden Depo. at 21:13–24:23. Black, non-Norteño inmates are also housed in A Module. *See* Deposition of Daniel Harrigan ("Harrigan Depo.") [Dkt. No. 145-4] at 23:13–22.

Fanaro has been in the Norteños since age 13. In 2011, Fanaro was housed at A Module and released without incident. Deposition of Jearhamel Fanaro ("Fanaro Depo.") [Dkt. No. 146-8] at 93:18–25.[3] In 2018, he was sentenced to serve 210 days at MDF for felony evasion of an

---

[1] I recount the facts in the light most favorable to Fanaro and note when they are disputed. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

[2] Citations to exhibits are to the ECF-generated page number.

[3] The defendants object that Fanaro's supporting exhibits were filed the day after his opposition and past the deadline. Dkt. Nos. 161 at 1, 165 at 1. But, to the extent they are referenced here, Fanaro's exhibits are things like depositions to which the defendants had access. There is no

officer.  *See* Dkt. No. 155-3 (booking file).  He was again housed at A Module.  Fanaro Depo. at 60:2–5.

### A. "Freezes" and Related Practices

Much of this case revolves around a Norteño practice called a "freeze."  When an inmate first enters A Module, he is placed on a freeze by other inmates.  *See, e.g.*, Harrigan Depo. at 28:15–29:2; Fanaro Depo. at 41:2–25.[4]  A freeze is akin to a probationary period and exists so that inmates can check the new inmate's standing with the broader Norteño organization.  Harrigan Depo. at 28:15–29:2.  When the new inmate arrives, he is questioned.  During a freeze, which usually encompasses an inmate's first few days at A Module, several other inmates escort the new inmate everywhere.  Fanaro Depo. at 33:23–35:8.  The inmate on the freeze is not permitted to wear shoes other than jail-issued sandals and cannot perform almost any normal activities like watching television.  *Id*.  If the inmate is reported to be in good standing with the Norteños, he "clears" the freeze.  *Id.* at 41:2–42:7.  If he does not clear the freeze, the Norteños "remove" the inmate from the gang, usually with violence.  Deposition of Francisco Ramirez ("Ramirez Depo.") [Dkt. No. 156-2] at 38:14–39:4.

The freeze is well-known to prison officials.  *See, e.g.*, Harrigan Depo. at 31:24–32:7 (officer testifying they happen "all the time"); *see also See* County Defendants' Motion for Summary Judgment ("County Mot.") [Dkt. No. 144] 3 (relying on that testimony).  The deputies who work at A Module are not trained to prevent freezes; instead, they are trained to monitor them and to intervene if an inmate does not clear the freeze.  *See, e.g.*, Deposition of Paul Murphy ("Murphy Depo.") [Dkt. No. 145-7] at 15:21–18:25.  Former Assistant Sheriff Matthew Schuler, who was in charge of CSB in 2018, said in his deposition that permitting inmates to put others on freezes was inadvisable and effectively let them "run the jail."  Dkt. No. 155-7 at 38:2–15.

---

prejudice to them in relying on any of the evidence discussed in this Order.

[4] The Deputy Defendants object to some of Harrigan's statements based on virtually every cognizable evidentiary basis available, without explaining any of them—in contrast to their explanations of why other evidence is allegedly inadmissible.  *See* Dep. Reply 1–2.  I will not, at summary judgment, exclude evidence on that basis.  If they are prepared to defend their objections, the Deputy Defendants should raise them in motions in limine.

According to one Norteño inmate, "most" incidents of violence at A Module occur when inmates do not clear freezes. Ramirez Depo. at 38:14–25. According to the County Defendants, they were not aware of any inmate on A Module being attacked while on a freeze and there were no reports of freezes ending in violence. *See* County Mot. 3 (collecting deposition citations).

Fanaro arrived at MDF on May 8, 2018, and was put in A Module at approximately 1:45 am on May 9. Dkt. No. 155-3. He was quickly asked for identifying information by other inmates. For his first few days, he was on a freeze. Fanaro Depo. at 32:9–17. Fanaro cleared his freeze in those first few days. *Id.* at 46:8–11.

**B. The Assault**

On May 14—five days after arriving and soon after he cleared the freeze—Fanaro pressed the emergency call button that every cell has. Ramirez Depo. at 44:21–45:17. When the button is pressed, a light above that cell turns on, a tone is triggered, an alarm rings every twenty-two seconds, and a light is activated at the deputy desk. Harrigan Depo. at 19:20–21:15. Deputies are supposed to respond to every emergency button activation. Murphy Depo. at 28:21–25. Anyone with access to the outside of the cell can deactivate the light and alarm. Harrigan Depo. at 19:20–21:15.

Fanaro pressed his button so that he could inform deputies that he wished to withdraw from the Norteños for religious reasons. *See* Ramirez Depo. at 47:1–9. But instead of a deputy responding, two other inmates did. Fanaro Depo. at 56:1–23. They deactivated the light and asked Fanaro why he pressed his button. *Id.* He told them he was having a panic attack—because it was Norteño practice to attack anyone who withdrew from the gang. *Id.* No deputy ever responded. According to Fanaro, deputies routinely did not respond to emergency button activations and effectively permitted inmates to respond instead. *See* Ramirez Depo. at 36:17–37:12.

Because Fanaro pushed the button, the Norteños put him back on a freeze. Fanaro Depo. at 59:5–8. After he pushed the call button, Fanaro told his cellmate that he wanted to drop out of the gang. *Id.* at 50:8–51:11. They both told other gang members of this intention via written messages. *Id.* Other inmates asked if he was sure even though he "knew what would happen" and

4

he said that he was. *Id.* at 52:2–11.

The next day, May 15, Fanaro was guarded by two inmates due to the freeze. *See, e.g.*, Harrigan Depo. at 14:7–15:19. He had a "free time period" and was falsely told by other inmates that he had cleared the freeze again. Fanaro Depo. at 52:12–17. They told him someone wanted to talk to him in A Module's courtyard. *Id.* One entrance to the courtyard is approximately twenty feet down a hallway from the guard desk. Deposition of Antonio Rosas ("Rosas Depo.") [Dkt. No. 158-6] at 13:8–13. According to an expert hired by Fanaro, screams from the courtyard echo around and would be "clearly audible" at the desk. *See* Report of Charles Salter ("Salter Rep.") [Dkt. No. 157-10] at 3.

Defendants Thomas Leon and Francisco Vargas—who were other inmates and who are not moving for summary judgment here—escorted Fanaro out to the courtyard. He was taken to an area that fell into a security camera's blind spot. Fanaro Depo. at 48:3–23; Schuler Depo. at 70:5–25. Once there, a group of inmates brutally attacked Fanaro. Fanaro Depo. at 69:22–71:3. According to one of the defendant inmates who participated, Fanaro's screams were loud and "blood curdling." Ramirez Depo. at 26:17–27:8. Fanaro was severely injured in the attack. When the free time period ended, other inmates returned to their cells; Fanaro did not until he finally stumbled back into the building, bleeding and battered.

There are two deputies on duty at A Module at a given time. Harrigan Depo at 22:18–25. The deputies on duty during the attack were defendants De Leon and Rosas. Dkt. No. 157-7 at 13. Both claim to have been unaware of the attack while it was happening and unaware of a risk of it in advance.[5] Declaration of Omar De Leon ("De Leon Decl.") [Dkt. No. 150-6] ¶¶ 5–7; Declaration of Antonio Rosas ("Rosas Decl.") [Dkt. No. 150-7] ¶¶ 4–6. De Leon and Rosas were at or near the guard desk when the attack occurred. *See* Deputy Defendants' Motion for Summary Judgment ("Dep. Mot.") [Dkt. No. 150] 4–5 (collecting defendants' representations to that effect); Plaintiff's Opposition to Dep. Mot. ("Dep. Oppo.") [Dkt. No. 157] 8–9 (taking the same position).

---

[5] It is undisputed that Fanaro never informed any prison official about his desire to leave the gang (though he tried by pressing the call button).

When inmates return to their cells, deputies are supposed to perform cell checks to ensure they are there and perform a check of the courtyard. Deposition of Omar De Leon ("De Leon Depo.") [Dkt. No. 158-4] at 16:16–25. De Leon did not perform those checks as he was supposed to; he falsely recorded himself as having done so in the jail's official records. *Id.*; *id.* at 13:7–14. As he admitted, he did that "so it seems like we did a security check." *Id.* at 18:23–19:1.

### C. Other Allegations

Fanaro also presents other evidence based primarily on the deposition of inmate defendant Ramirez, who was one of the assaulters. According to Ramirez, the Norteño inmates were aware of the blind spot in the courtyard security cameras and made use of it to attack people. Ramirez Depo. at 17:13–20. According to the jail's records, only four of forty-eight inmate-on-inmate attacks took place in the courtyard; it is unclear from the cursory report that any were in the blind spot. *See* Dkt. No. 145-9. Ramirez also stated that the gang had a few deputies "in [its] pocket." Dkt. No. 157-3 at 12:7–25. According to him, deputies implicitly permitted Norteños to commit acts of violence that were of a lesser degree than stabbings. *Id.* at 7:12–22.

## II.    PROCEDURAL BACKGROUND

Fanaro filed his original complaint in June 2019. Dkt. No. 1. In October 2019, I granted in part and denied in part a motion to dismiss with leave to amend some claims. Dkt. No. 36. In December 2019, I denied Leon's motion for summary judgment without prejudice pending further discovery. Dkt. No. 46. Fanaro filed a First Amended Complaint naming additional deputies and filed a Second Amended Complaint in response to my order. Dkt. Nos. 33, 39. In January 2020, I granted De Leon and Rosas's motion to dismiss some of the claims against them. Dkt. No. 60. Due to the COVID-19 pandemic, the trial schedule was continued. Dkt. No. 72. I also resolved a series of discovery disputes between the parties. *See* Dkt. Nos. 85, 108, 127, 131, 137.

Fanaro filed his Third Amended Complaint ("TAC") [Dkt. No. 94] in November 2020. On March 26, 2021, the County Defendants moved for summary judgment. On March 31, 2021, De Leon and Rosas (represented by different counsel) moved for summary judgment. I held a hearing on both motions on May 5, 2021.

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

Although Fanaro also brings several state-law claims, most of his claims are brought under 42 U.S.C. § 1983 ("Section 1983")[6] for violation of the Eighth Amendment.[7] The Eighth Amendment provides, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." That Amendment's protections apply squarely to treatment of those who are incarcerated. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). In

---

[6] 42 U.S.C. § 1983 creates a civil cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

[7] The Eighth Amendment is applicable to states and their political subdivisions through incorporation by the Fourteenth Amendment. *Baze v. Rees*, 553 U.S. 35, 47 (2008).

1   addition to prohibiting cruel and unusual punishment, it places affirmative duties on prison

2   officials. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). As relevant here, "prison officials have a

3   duty to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (internal

4   quotation marks and alterations omitted); *see also Castro v. Cty. of Los Angeles*, 833 F.3d 1060,

5   1067 (9th Cir. 2016) (discussing the "right to be free from violence at the hands of other

6   inmates"). The particular duties this right imposes on various defendants are described below.

7   **I.      EIGHTH AMENDMENT CLAIMS AGAINST DEPUTIES**

8        Fanaro brings claims against four deputies, two of whom (De Leon and Rosas) were on

9   duty when he was assaulted. As noted, "prison officials have a duty to protect prisoners from

10  violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. This duty is crucial because

11  the government has "stripped [those who are incarcerated] of virtually every means of self-

12  protection and foreclosed their access to outside aid," so it "and its officials are not free to let the

13  state of nature take its course." *Id.* "Being violently assaulted in prison is simply not part of the

14  penalty that criminal offenders pay for their offenses against society." *Id.* at 834 (internal

15  quotation marks omitted).

16       Not every attack by another inmate leads to liability for prison officials. There are two

17  requirements necessary for an Eighth Amendment violation. First, "the deprivation alleged must

18  be, objectively, sufficiently serious." *Id.* Second, the prison official must have "deliberate

19  indifference" to the prisoner's health or safety. *Id.* But "direct causation by affirmative action is

20  not necessary: a prison official may be held liable under the Eighth Amendment if he knows that

21  inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable

22  measures to abate it." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (internal quotation

23  marks and alteration omitted).

24       **A. De Leon and Rosas**

25       The Deputy Defendants were on duty during the assault. As relevant here, Fanaro brings

26  two virtually duplicative Eighth Amendment claims against them. TAC ¶¶ 72, 104. Their motion

27  for summary judgment on those claims is DENIED.

28

###### i.  Violation of a Constitutional Right

The Deputy Defendants argue that Fanaro has failed to allege facts that could show they disregarded an unreasonable risk of harm to him.  Dep. Mot. 8–11.  Fanaro has put forward facts that prevent summary judgment.

A jury could find, from Fanaro's evidence, that deputies were generally aware of freezes and aware of the danger they posed.  *See, e.g.*, Harrigan Depo. at 31:24–32:7; Murphy Depo. at 15:21–18:25.  Freezes happened when new inmates arrived, rendering it obvious who would be placed on a freeze.  The freezes were marked by external signs visible to any deputy, including other inmates escorting the new one around.  The sanction for failing a freeze was also clear: likely violence.  Fanaro Depo. at 33:23–35:8.  Deputies were trained to monitor freezes in case the inmate did not clear them, but not stop them altogether.  Murphy Depo. at 15:21–18:25.  Yet there is no evidence that De Leon and Rosas intervened or even monitored what was happening to Fanaro.  Just before the attack, other inmates led Fanaro out to the courtyard while he was on a freeze.  De Leon and Rosas were not monitoring them at that time either.  Accordingly, a reasonable jury could find that De Leon and Rosas knew of a substantial risk of violence to Fanaro because he was on a freeze and disregarded that risk.

This aside, the evidence from one of the attackers is that Fanaro's screams were piercingly loud—indeed, "blood curdling."  Ramirez Depo. at 26:17–27:8.  He says that the screams got so loud that the attackers were shouting at Fanaro to shut up.  *Id.*  Fanaro has introduced evidence from which a reasonable jury could conclude that De Leon and Rosas knew the attack was occurring.  The attack happened in A Module's courtyard.  That courtyard is roughly twenty feet from the guard desk, according to Rosas.  Rosas Depo. at 13:8–13.  Such loud screams from such a close location would adequately support Fanaro's theory on their own, but he has also introduced an expert report showing that such sounds could be heard at the desk.  *See* Salter Rep. at 3.[8]  And neither disputes that they were at or near the desk at the approximate time the attack

---

[8] The Deputy Defendants attack the methodology of the report.  Dep. Reply 4.  They assert that the expert only accounted for an empty area, while one full of people would dampen the sound.  That is an issue of weight, not one for exclusion under *Daubert* or the Federal Rules of Evidence.  *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010).  The Deputy

took place. Consequently, a reasonable jury could conclude that they were aware of violence occurring and did nothing.

The Deputy Defendants have little to say in response; most of their argument recites general points of law. *See* Dep. Mot. 10–11; *see also* Deputy Defendants' Reply to Dep. Oppo. ("Dep. Reply") [Dkt. No. 165] at 5–7.[9] Their substantive argument makes several unconvincing assertions. They argue Fanaro that has not "stated specific facts demonstrating that he was at risk of assault by other inmates." Dep. Mot. 10. He has: he was on a freeze. Next, they say that Fanaro failed to "inform[] prison officials of this risk." *Id.* While a specific communicated threat from the victim may bolster a case, the law does not require it. An official can be deliberately indifferent so long as he *knows* of the threat, as De Leon and Rosas could be found to have been, regardless of whether the victim explicitly told them. *See, e.g.*, *Clem*, 566 F.3d at 1182. And an official can be found deliberately indifferent if the threat is *obvious*, as a reasonable jury could find here, regardless of whether the victim explicitly told them. *See, e.g.*, *Castro*, 833 F.3d at 1076. The Deputy Defendants also contend that neither of them "refused to respond to his requests for a transfer or otherwise address his concerns." Dep. Mot. 10. Again, that is a red herring: the law has no such requirement.

To the extent their response is factual, it is unpersuasive at summary judgment. They repeatedly insist they did not know about or hear the attack. Deputy Defendants Reply ISO the Dep. Mot. ("Dep. Reply") [Dkt. No. 165] 8. But their citation for that deeply contested assertion is their own depositions and declarations. *Id.* Needless to say, if there is evidence to the contrary—as explained, there is—that does not cut it at summary judgment. They also contend

---

Defendants also take issue with a lack of authentication of the Report. It would have been ideal for Fanaro to authenticate it. Because the case it at summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial." *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001). There is little doubt the report's author can authenticate it when the time comes.

[9] The Deputy Defendants raise numerous objections to Ramirez's testimony. As explained elsewhere, I agree with them on some specific evidence. The facts that come from Ramirez in this portion, however—which are not all of the facts Fanaro relies on him for—are either admissible on their own (such as his narration of what occurred) or are sufficiently likely to be reducible to an admissible form at trial (such as the likely results of a freeze).

that they are relieved of liability because the injuries "were completely caused by Norteño inmates who acted on their own accord." *Id*. If that argument were accepted, no inmate violence claim under the Eighth Amendment could ever succeed because the other inmate is always responsible for it. This theory contradicts the law: the constitutional violation exists for officials' failure to prevent the attack. *See, e.g.*, *Farmer*, 511 U.S. at 833.

Relatedly, the Deputy Defendants claim that the injuries were *most* directly caused by Fanaro's choice to withdraw from the gang. Again, that does not necessarily remove the constitutional duty to take reasonable steps to protect Fanaro. A reasonable jury could find that the Deputy Defendants' failure to prevent the assault or intervene is both a but-for and proximate cause, even if Fanaro's withdrawal was the most immediate link in the causal chain. Indeed, the entire reason deputies monitor the freeze is that it may end in violence; the Deputy Defendants' arguments are unpersuasive.

Fanaro was briefly taken off the freeze before being placed back on it, which the Deputy Defendants attempt ot use as an excuse. But there is no evidence that De Leon and Rosas were aware that the freeze ended and, consequently, would no longer have to monitor Fanaro in this way. Additionally, Fanaro continued to be guarded and escorted, the obvious signs of a freeze.

In any case, none of this answers the evidence that the Deputy Defendants likely heard Fanaro's screams. They imply that there was so much noise from televisions and radios that the sound may have been drowned out. Dep. Mot. 4–5. That is in dispute and is a matter for the jury.

Because I conclude that a jury could reasonably find for Fanaro on this claim, there is no need to address whether some of his other allegations—such as De Leon not performing a cell check—could result in liability independantly.

### ii. Qualified Immunity

De Leon and Rosas separately argue that, regardless of any constitutional violation, they are entitled to qualified immunity. Dep. Mot. 12–18. They are not.

Qualified immunity shields governmental officials from Section 1983 liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To determine

whether an officer is entitled to qualified immunity, a court must evaluate two independent questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident." *Castro*, 833 F.3d at 1066 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

For the reasons explained above, a jury could find that De Leon and Rosas's actions violated the Constitution. They nonetheless argue that "a reasonable officer in defendants' shoes, knowing what defendants knew, could have mistakenly but reasonably perceived that taking no additional measures to protect Plaintiff was lawful." Dep. Mot. 17. They are wrong.

The right was clearly established and a jury could conclude a reasonable officer would understand that De Leon and Rosas's conduct violated that right. To start, a jury could find that reasonable officers would know that a freeze has two outcomes: the new inmate clearing the freeze or a strong likelihood of violence: that is why deputies are told to monitor freezes. *See* Murphy Depo. at 15:21–18:25. When a path will predictably end in violence by one inmate on another, and the deputies know that, a jury could find that a deputy who ignores this risk disregards his constitutional duty to take reasonable steps to protect the victim. *Cf. Castro*, 833 F.3d at 1067 ("[T]he jury found that both Solomon and Valentine understood that placing Castro in a cell with a combative inmate, when the cell had no audio or video surveillance and only occasional monitoring, could lead to serious violence against Castro. Substantial evidence supports those findings.").

Further, the Deputy Defendants' argument is no answer to Fanaro's evidence that they failed to intervene *in the moment* when his screams echoed around the courtyard and through the halls. It should almost go without saying that if a reasonable prison official actually perceives violence by one prisoner against another—visually or auditorily—he has a duty to protect (consistent with other considerations not at issue here, such as the safety of other inmates, prison officials, and the officer).

The Deputy Defendants rely on a bevy of cases for the proposition that they must have

been more aware of the threat than De Leon and Rosas were in order to be liable. *See* Dep. Mot. 12–14. To begin, I must view the evidence in the light most favorable to Fanaro; for the reasons explained above, the evidence under that light could lead a reasonable jury to believe that De Leon and Rosas were aware of the imminent risk of violence. Additionally, the Deputy Defendants' cases, particularly the Ninth Circuit ones, deal with the problem of a more diffuse or generalized risk than here. For instance, one of them found that officials were not deliberately indifferent to the risk of violence following a fight between two inmates housed in the same cell just because there had been a fight between one of those inmates and a fellow gang member of the other several days earlier. *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1161 (9th Cir. 2013). Here, freezes are monitored because they may predictably result in violence and, in any event, the deputies could reasonably have known of the violence while it was happening.[10]

More fundamentally, the Deputy Defendants state or imply that Fanaro needs to point to a specific past case that is on all fours factually to show that a right is "clearly established." *See* Dep. Mot. 18. The Supreme Court has repeatedly (including just months ago) rejected this understanding. There are, it has explained, "instances [in which] a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *accord Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam) (citing *Hope* and other decisions to that effect). Sometimes, perfect factual identity is unnecessary because "general statements of the law [can] giv[e] fair and clear warning." *United States v. Lanier*, 520 U.S. 259, 271 (1997). For this to be so, "in the light of pre-existing law[,] the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

So it is here. Both the constitutional right to be free from attacks at the hands of other prisoners and the corresponding duty on prison officials to take reasonable measures to protect prisoners from those attacks are clearly established and were at the time of these events. *See, e.g.*,

---

[10] Many of the Deputy Defendants' cases are not even arguably applicable. One of their few Ninth Circuit cases, for example, was about the excessive sentencing aspect of the Eighth Amendment, not a failure to protect. *See United States v. Tolias*, 548 F.2d 277, 279 (9th Cir. 1977).

*Castro*, F.3d at 1067; *Farmer*, 511 U.S. at 833. The question here is "whether a reasonable prison official would have believed his or her conduct to be lawful in light of this pre-existing law." *Robinson v. Prunty*, 249 F.3d 862, 867 (9th Cir. 2001). Taking the contested evidence in the light most favorable to Fanaro, a factfinder could conclude that De Leon and Rosas were aware of the risk of the attack and disregarded it. A factfinder could even find that they were aware of the attack while it was happening and did nothing. Reasonable prison officials could not have believed that this conduct was lawful because it violates the most fundamental principles of the clearly established law cited above. This is not one of those situations in which a plaintiff seeks to define the right in question at such a high level of generality to rope in conduct that reasonable officials would not necessarily understand violated the right. *See, e.g.*, *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

Finally, the Deputy Defendants' defense of qualified immunity is not, as in some prison cases, that they had to make a tough choice between competing legitimate interests in the fraught atmosphere of a prison that resulted in Fanaro's assault. *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). To the contrary, their theory is that they were unaware of the risk or the attack at all. *See, e.g.*, Reply 10–11. That is an issue for the jury because there is sufficient evidence going the other way to survive summary judgment. They are not entitled to qualified immunity.[11]

**B. Burnthorne**

Fanaro brings two Eighth Amendment claims against Burnthorne based on a "special relationship" and a failure to protect. *See* TAC ¶¶ 72, 104. The motion for summary judgment on claims one and seven against Burnthorne is GRANTED.

---

[11] The Deputy Defendants cite many excessive force cases to bolster their position. But "specificity is especially important in the Fourth Amendment context," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) because "the question whether an officer has used excessive force requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation marks omitted). As a result, the Court has often found that officers who used excessive force did not violate clearly established law. The right to be free from attacks by other inmates is, as explained, clearly established. While certain *fact patterns* concerning that right may lead to qualified immunity, this is not one for the reasons explained.

14

In the Complaint, Fanaro made many of the same generic allegations against Burnthorne as all of the defendants, including the alleged collusion with Norteños. Yet Burnthorne is referenced in Fanaro's brief only once—and even then for the factual point that he was scheduled to work when Fanaro was booked in, not to argue he is subject to liability. *See* Opposition to County Mot. ("County Oppo.") [Dkt. No. 154] 4.

Burnthorne's declaration, however, states that he did not work on A Module from May 9 to May 15, 2018. Declaration of Christopher Burnthorne ("Burnthorne Decl.") [Dkt. No. 145-8] ¶ 8. Although he did work at A Module on May 8 (when Fanaro arrived at MDF), Fanaro did not arrive at A module until the very early morning on May 9. *Id.* ¶¶ 4–5. Burnthorne says that Fanaro did not arrive while he was working there, though he does not state what time he stopped working. *Id.* ¶ 6. In his deposition, Fanaro stated that the "freeze" began the first time he left his cell for a free-time period, which was that next day. *See* Fanaro Depo. at 31:15–33:7. Accordingly, the evidence indicates that Burnthorne is unconnected to these events.

In his Opposition, Fanaro makes no attempt to introduce a dispute of material fact about any of this. Indeed, he does not attempt to defend the claims against Burnthorne at all; consequently, they would be abandoned even if there were evidence that could be gleaned in support. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009); *Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005); *Marentes v. State Farm Mut. Auto. Ins. Co.*, 224 F. Supp. 3d 891, 919 (N.D. Cal. 2016). This aside, Fanaro's evidence does not show a material dispute, so summary judgment on the claims against Burnthorne is appropriate. There is no evidence that Burnthorne "handed Fanaro over" to other inmates because he was not working at A Module when Fanaro arrived. Fanaro was taken to his cell by other deputies and the "freeze" began during the first free-time period therafter, when Burnthorne was indisputably not working.

## C. Arata

Fanaro brings two Eighth Amendment claims against Arata based on a "special relationship" and a failure to protect. *See* TAC ¶¶ 72, 104. The motion for summary judgment on claims one and seven against Arata is GRANTED.

As with Burnthorne, the allegations in the *complaint* against Arata are generic. The only

arguably particularized allegation is that it was Arata who failed to respond to the emergency button. *See* TAC ¶ 43. But Fanaro points to no evidence backing this up and, indeed, does not reference Arata once in his brief. Moreover, on the issue with the call button, Arata states that he did not work on May 14, 2018, the day that Fanaro pushed the button. Declaration of Brandon Arata ("Arata Decl.") [Dkt. No. 145-13] ¶ 4. Summary judgment is appropriate in light of the lack of disputes of fact of any evidence connecting Arata to the injuries, not to mention Fanaro's abandonment of any defense for his claim against Arata. *Ramirez*, 560 F.3d at 1026; *Jenkins*, 398 F.3d at 1095 n.4; *Marentes*, 224 F. Supp. 3d at 919.

## II.    SUPERVISORY CLAIMS

Fanaro brings several Eighth Amendment claims against the Supervisor Defendants, Sheriff David Livingston, Undersheriff Michael Casten, then-Assistant Sheriff Matthew Schuler, and Lt. Connie Sanders. *See* TAC ¶¶ 72, 77, 82, 87, 93. These claims include standard deliberate indifference claims but also claims based on a failure to train and claims that group the Supervisor Defendants with the Entity Defendants for purposes of *Monell* policy claims. The motion for summary judgment on all claims against these defendants is GRANTED.

Each of the Supervisor Defendants moves for summary judgment based on the individual record as it relates to him or her. *See* County Mot. 13–20. Fanaro's Opposition does not engage with these arguments. Even though Fanaro defends particular charges against other defendants, he never explains what evidence supports a valid theory of supervisory liability. At best, his Opposition lumps together unspecified groups of defendants and makes capacious statements about them all (often with no record citations). *See, e.g.*, County Oppo 7. Indeed, Livingston and Casten are only mentioned in the caption, nowhere else. Aside from citations to his deposition for facts, Schuler is only mentioned as the one who made the choice to house all Norteños together. *See* County Oppo. 3. Sanders is referenced a few more times for her evidence, but never to explain why she is subject to Section 1983 liability. Fanaro also did not address these claims at the hearing.

Construing the brief liberally, Fanaro is arguing that all County defendants are subject to Eighth Amendment liability for the same reasons. *See, e.g.*, County Oppo. 12–14 (discussing the

"defendants'" liability). That is insufficient. "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks omitted). This causal connection can exist either "by setting in motion a series of acts by others or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207–08 (internal quotation marks, citations, and alterations omitted). And that supervisor can be liable "for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* (internal quotation marks omitted).

As this explanation makes clear, supervisory liability is individualized. Fanaro must demonstrate that each supervisor is subject to liability under these principles. *Cf. Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) ("The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."). Here, the record is uncontradicted that each of the four Supervisor Defendants performs different roles. Livingston supervises the entire Sheriff's Office, Casten is the second-in-command of that office, Schuler ran the CSB that is responsible for all county jails, and Sanders ran MDF. *See, e.g.*, Schuler Depo 7:12–23, 11:3–20. Fanaro cannot simply put together all defendants with policymaking authority and say they are all liable for the same reasons. His Opposition makes no attempt to introduce particularized disputes of material fact in response to the Supervisor Defendants' specific arguments. I explain below why Fanaro's *Monell* claim is viable based on the "freeze." Because that claim depends on policies, practices, or customs, it would seem commonsensical that a particular supervisor might also be plausibly shown to have committed violations based on it. But Fanaro has not shown individualized responsibility, mental state, or causation related to any of the individual defendants and the freeze. There is no genuine dispute of material fact that any Supervisor Defendant was involved in his

injury or otherwise committed a constitutional violation.

### III. *MONELL* CLAIMS

Fanaro brings several overlapping claims under the Eighth Amendment against the County and Sheriff's Office (the "Entity Defendants"). TAC ¶¶ 72, 77, 82, 87, 93. The Entity Defendants move for summary judgment on all of them. The motion for summary judgment is GRANTED IN PART and DENIED IN PART as explained below.

In *Monell v. Department of Social Services of City of New York*, the Supreme Court held that municipalities and local governments can be liable under Section 1983. 436 U.S. 658, 690–91 (1978). They may not, however, be held liable on a theory of *respondeat superior*. *Id.* at 691. Instead, they can be liable for their own constitutional violations: those of their policies, practices, or customs. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "The Court has further required that the plaintiff demonstrate that the policy or custom of a municipality 'reflects deliberate indifference to the constitutional rights of its inhabitants.'" *Castro*, 833 F.3d at 1073 (citing *Canton*, 489 U.S. at 392)).

Accordingly, the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton*, 489 U.S. at 386. Then a plaintiff must show that the policy, practice, or custom, was "a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Castro*, 833 F.3d at 1075 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, (1986) (plurality opinion)) (internal quotation marks and alteration omitted). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (internal quotation marks and alterations omitted).

#### A. Policies, Customs, and Practices Theories

Fanaro puts forward several policies, practices, or customs that he argues create liability.

He sometimes separates them and sometimes groups them into various configurations. I conclude that a reasonable jury could find that the alleged policy, custom, and practice of permitting inmates to put other inmates on "freezes" that will either end in acceptance or violence violates the Eighth Amendment. Other policies, practices, and customs related to freezes bolster this conclusion. To streamline proceedings, I rule on whether several other policies, alone, suffice.

### i. "Freezes" and Related Policies and Practices

The policy, practice, or custom of permitting Norteños to place each other on freezes and several attendant policies survive summary judgment. To start, the freeze's existence is adequately supported by the evidence—indeed, the County Defendants admit its existence. They represent that the Sheriff's Office "trained deputies to be aware of the freeze and to monitor the inmate who was the subject of the freeze." County Defendants Reply ISO County Mot. ("County Reply") [Dkt. No. 161] 11. And the evidence shows that deputies were told to follow this practice. *See, e.g.*, Harrigan Depo. at 31:24–32:7; Murphy Depo. at 15:21–18:25.

There are genuine disputes of material fact about the causal link between this practice and the constitutional deprivation. A jury could find that Fanaro's constitutional rights were violated when he was brutally assaulted by other inmates without the protection of prison officials. It could also reasonably find that the alleged decision to permit these freezes was causally linked to the assault: If inmates were not able to place new inmates in a probationary period that was likely to end in violence, Fanaro may likely not have been assaulted.

The County defendants are correct that Fanaro was briefly taken off the freeze before being placed back on, but that creates (at most) a genuine dispute of fact about causal linkage; it does not entitle them to summary judgment. The County Defendants are similarly correct that the *most* immediate precipitating event was Fanaro revealing he wished to leave the Norteños. But it will be up to a jury to determine whether that was a superseding event that severed the causal chain from the policy at issue. A reasonable jury could find that, if inmates did not believe they could end the freeze in violence, they would not have assaulted Fanaro for attempting to leave the gang. It could also conclude that, if not for constant escort that comes with a freeze, Fanaro would have had ample opportunity to tell deputies he wanted to leave the gang without them knowing, which

19

would plausibly have avoided the assault.

There are also genuine disputes of material fact about officials' deliberate indifference. For the reasons explained above with respect to the Deputy Defendants, and incorporated here, a jury could find that tolerating the freezes is a deliberate choice to not respond to a known or obvious risk to inmates' constitutional rights. In brief, officials were aware that freezes had two outcomes, one of which was likely to be violence. A jury could find that, by permitting freezes to occur, officials disregarded that risk of violence.

Finally, the freeze is intimately connected with several other alleged policies or practices that the parties sometimes treat separately. In particular, Fanaro discusses various alleged failures to supervise inmates, failures to monitor security camera footage, tacitly permitting inmates to respond to alarms (as discussed above), failures to discipline inmates, and more general support for the Norteño power structure in MDF. *See* County Oppo. 5–8, 12–13. All of this is reasonably linked to Fanaro's harm through the freeze; it is relevant at least for purposes of showing deliberate indifference to a jury. For example, Fanaro's allegation that deputies essentially permitted other inmates to respond to alarm calls could be reasonably found to be causally connected to his assault and indicative of deliberate indifference. Because all of these policies together can help demonstrate Fanaro's claims, there is no need to analyze whether any particular aspect of them would be sufficient on its own. I do, however, rule on several other discrete policies below that cannot support liability.

### ii. Alleged Camera Deficiencies

Fanaro alleges that the *existence* of security camera blind spots was deliberately indifferent. *See* County Oppo. 5. Because only one such blind spot was arguably connected to the assault and Fanaro does not discuss any others, I address that one. The County Defendants have presented evidence at the vast majority—forty-four of forty-eight—incidents of violence did not occur in the courtyard, let alone the courtyard's blind spot. Dkt. No. 145-9 at 3. Though their records are not particularly clear or comprehensive, they state that no incident can be "conclusively" placed in the blind spot. *Id.* That characterization is nebulous but, despite taking extensive discovery, including about each of the incidents of violence, Fanaro has not rebutted this

evidence with any other evidence showing that officials disregarded the potential risk that was allegedly created. This alleged placement of security cameras cannot support an Eighth Amendment claim.

### iii. Number of Patrols and Officers on Duty

Fanaro repeatedly states that there should have been more guards on duty instead of two or that there should have been more patrols on the roof watching the courtyard. He has presented no evidence that there was any deliberate indifference in this choice which, without such evidence, is a run-of-the-mill penological policy decision.

### iv. Housing all Norteños Together

Fanaro appears to argue that the choice to house all Norteños together in A Module is a constitutional violation. *See, e.g.*, County Oppo. 6–7, 13. On this record, it is not. The choice to house them all together in 2011 was made to *reduce* the violence that occurred from them being spread out through the prison. *See* Schuler Depo. at 20:25–21:9; Wooden Depo. at 21:13–24:23. That is a matter of penological policy. To show that it ran afoul of the Eighth Amendment, Fanaro would have to show that, in making the choice, policymakers disregarded the obvious risk of a constitutional deprivation. He has presented no evidence of this, other than the fact that fights occur in A Module. But violence occurred with the previous setup too; that is why the decision was made. Fanaro would therefore have to show genuine disputes of material fact that the risks were greater with this setup *and* that officials disregarded those risks *and* that the choice is not entitled to the substantial deference courts give in policy matters like this. *See Starr*, 652 F.3d at 1207; *Bell*, 441 U.S. at 547. He has done none of these.

## B. Failure-to-Train Theory

Fanaro's fourth claim for relief alleges a failure to train. TAC ¶¶ 87–92. Such a claim can support Section 1983 liability, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officials] come into contact." *Canton*, 489 U.S. at 388. The deficient policy training must be the result of a "deliberate choice" and must be the "moving force" behind the constitutional violation. *Id.* at 388–89. In his brief, Fanaro never indicates what alleged training deficiencies existed, or any record evidence to support them. His

Opposition addresses this claim in one sentence, which is entirely taken up by quoting *Canton*. *See* County Oppo. 12. This is conclusory and insufficient. The County Defendants would not even fairly know what the alleged deficiencies in training were from Fanaro's complaint or briefing. The motion for summary judgment is GRANTED to the extent it is predicated on a failure to train.

### C. Claims Against the County

The County argues that, no matter the state of the *Monell* claims, liability does not run to it because Fanaro focuses entirely on the alleged policies, practices, and customs of the Sheriff's Office and MDF. County Reply 3. Fanaro often groups together all defendants in his Opposition, making it difficult to determine on what grounds he believes the County itself is liable. But the County is the governmental unit responsible for the Sheriff's Office, which is a component part of it. No one disputes that the Sheriff's Office is the agency responsible for the County's decisions when it comes to running MDF. The municipality is liable in these circumstances. *See, e.g.*, *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 408 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 471 (1986). Without any authority to the contrary, the County has not shown that the claims against it should be dismissed.

## IV. STATE-CREATED DANGER CLAIM

Fanaro's fifth claim for relief is styled "state-created danger"; he purports to bring it under the Eighth Amendment. TAC ¶¶ 93–98. He alleges that the Entity and Supervisor Defendants "affirmatively placed [him] in a position of danger" with their policies, practices, and customs that failed to prevent the attack. *Id.* ¶ 95. The defendants argue that a state-created danger claim cannot be brought by a prisoner in custody because it stems from due process principles but the Eighth Amendment provides the proper vehicle to bring such a claim. *See* County Mot. 7–8. The motion to dismiss this claim is GRANTED.

"The general rule is that a state actor is not liable under the Due Process Clause for its omissions." *Pauluk v. Savage*, 836 F.3d 1117, 1122 (9th Cir. 2016) (internal quotation marks and citations omitted). One exception to this rule is the "state-created danger" doctrine. Under that exception, there can be a due process violation "when the state affirmatively places the plaintiff in

22

danger by acting with deliberate indifference to a known or obvious danger." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011) (internal quotation marks and citations omitted). Even though Fanaro's claim is purportedly brought under the Eighth Amendment, the state-created danger exception stems from substantive due process. *See Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000). All of the cases Fanaro relies on likewise make clear the doctrine is rooted in the Due Process Clause. *See* County Oppo. 17.

The Supreme Court has explained that "[b]ecause we have always been reluctant to expand the concept of substantive due process . . . where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (internal quotation marks, citations, and alteration omitted); *see Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002) (applying this principle to false arrest and prosecution claims). The Court has also explained that this rule applies squarely to the Eighth Amendment. *See United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).

Here, Fanaro's state-created danger claim is based on the same conduct by the same defendants on the same deliberate-indifference-based theory of liability as his Eighth Amendment claims. Although the defendants dispute whether those claims are meritorious, no one disputes that they are the sort of claims that are properly alleged under the Eighth Amendment. *See, e.g.*, *Castro*, 833 F.3d at 1066 (holding such claims cognizable). Accordingly, Fanaro's due process-based state-created danger claim is superseded by the more finely-tuned framework of the Eighth Amendment. Fanaro's Opposition responds only with irrelevant cases unrelated to the Eighth Amendment. *See* County Oppo. 17.[12] The claim is dismissed.

---

[12] Fanaro also purports to bring his first claim for relief, labelled "special relationship," under the Eighth Amendment. Compl. ¶¶ 72–76. The existence of a special relationship is the other primary exception to the no-duty rule under substantive due process principles. *Pauluk*, 836 F.3d at 1122. This claim seems duplicative of some of Fanaro's other Eighth Amendment claims but no party moves to dismiss it based on the more-specific-provision rule, so I do not address that rule's application. It is also possible that Fanaro used this terminology to attempt to capture the same thing as his other claims: prison officials' failure to protect inmates under cases like *Farmer*.

23

## V.     STATE-LAW CLAIMS

### A.  Negligence

Fanaro's sixth claim is for negligence under California law against De Leon, Rosas, Burnthorne, and Arata. TAC ¶¶ 99–103.  De Leon and Rosas's motion for summary judgment on the claim is DENIED; Burnthorne and Arata's is GRANTED.

Negligence generally "consists of a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm." *City of Santa Barbara v. Superior Ct.*, 41 Cal. 4th 747, 753–54 (2007).  "An action in negligence requires a showing that the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of injuries suffered by the plaintiff." *Bryant v. Glastetter*, 32 Cal. App. 4th 770, 777 (1995) (internal quotation marks and citations omitted).  In California, subject to certain exceptions, "a public employee is liable for injury caused by his act or omission to the same extent as a private person." CAL. GOV'T CODE § 820(a).

#### i.     Administrative Exhaustion

The County and Deputy Defendants first argue that, under California law, Fanaro was required to exhaust administrative remedies to bring his negligence claim.  County Mot. 32–33; Dep. Mot. 18–19.  Fanaro replies that he was not required to exhaust administrative remedies because he was no longer in custody when he filed his complaint.  County Oppo. 16; Dep. Oppo. 13–16.  Although this appears to be an issue that has not previously been addressed, I conclude that Fanaro was not required to exhaust.

Generally, "where an administrative remedy is provided . . . relief must be sought from the administrative body and this remedy exhausted before the courts will act." *Upshaw v. Superior Ct.*, 22 Cal. App. 5th 489, 505 (2018) (internal quotation marks omitted).  This rule applies squarely to prisoners bringing claims against prisons or their employees. *Wright v. State of California*, 122 Cal. App. 4th 659, 665 (2004).  The rule is intended to give the prison the first shot at remedying the problem before judicial intervention. *Upshaw*, 22 Cal App 5th at 505.  This state-law exhaustion requirement "parallel[s]" the federal exhaustion requirement under the Prison

24

Litigation Reform Act ("PLRA"). *Wright*, 122 Cal. App. 4th at 666. But unlike the PLRA analog, a failure to exhaust under California law is a jurisdictional bar. *Id.* at 665; *Upshaw*, 22 Cal. App 5th at 505.

Here, Fanaro filed his complaint *after* he was released, so he was not required to exhaust. Neither I nor the parties have found a definitive decision on this issue, but all traditional considerations lead to the conclusion that the exhaustion requirement no longer applies once a plaintiff is no longer serving his sentence. The cases imposing the exhaustion requirement uniformly speak of "prisoners" being required to exhaust remedies. *Wright*, 122 Cal. App. 4th at 664–665; *Upshaw*, 22 Cal. App 5th at 505. That is, they are concerned with complaints filed while incarcerated. The rule serves the aims of giving the prison the first shot at resolving a problem without judicial intervention, preventing courts from "t[aking] over the day-to-day operation of jails and prisons," and filtering out frivolous claims. *Wright*, 122 Cal. App. 4th at 665. Although the third worry exists in any case, the first two rationales underlying the rule no longer apply once someone is released from custody. There is no relief the prison can offer someone who is no longer a prisoner. Here, for instance, there was nothing that MDF could do to remedy Fanaro's harm when he filed his complaint. Relatedly, once a plaintiff is no longer incarcerated, the judicial remedy will usually be damages, not an injunction that inserts a court into the operations of the facility. This is all precisely why the exhaustion rule applies when "an administrative remedy [i]s still available." *Id.* at 671.

California treats its exhaustion requirement as "[p]aralleling" the PLRA's requirement. *Id.* at 666. Under the PLRA, it is well-established that "a person not incarcerated or detained . . . at the time the action is filed is not a 'prisoner' for purposes of the statute, and therefore, not subject to the exhaustion requirement." *Talamantes v. Leyva*, 575 F.3d 1021, 1023 (9th Cir. 2009) (some internal quotation marks omitted). The defendants point out that this holding flows directly from the PLRA's statutory text while the state-law requirement is judicially created. Dep. Reply 11. That is true, but both requirements speak of "prisoners," both are motivated by the same essential concerns that are no longer served once someone is released from custody, and California law is clear that the two run in "parallel." Accordingly, Fanaro was not required to exhaust his claim.

### ii. De Leon and Rosas

Beyond their exhaustion argument, De Leon and Rosas offer no reason that the negligence claim would not survive summary judgment on the merits except the suggestion that if the Section 1983 claims fail, this does as well. Their motion is DENIED.

### iii. Burnthorne and Arata

The negligence claim against Burnthorne and Arata is insufficient for reasons already addressed. Fanaro has not presented any record evidence that his injuries are causally linked to Burnthorne and Arata's actions. He does not present record evidence of what those actions were, which is fatal to the breach element and to the claim more generally. His brief does not utter one word on the merits of the negligence claim against them, so it would be waived in any case. *Ramirez*, 560 F.3d at 1026; *Jenkins*, 398 F.3d at 1095 n.4; *Marentes*, 224 F. Supp. 3d at 919. Their motion is GRANTED.

### B. Assault and Battery

Fanaro's tenth claim is for assault against the non-moving inmate defendants and De Leon, Rosas, Burnthorne, and Arata. TAC ¶¶ 124–29. The eleventh claim is for battery against those defendants. *Id.* ¶¶ 130–36. The motions for summary judgment by the four deputy defendants on both claims are GRANTED.

Under California law, "[a] civil action for assault is based upon an invasion of the right of a person to live without being put in fear of personal harm." *Thing v. La Chusa*, 48 Cal. 3d 644, 649 (1989) (internal quotation marks omitted). "The tort of assault is complete when the anticipation of harm occurs." *Kiseskey v. Carpenters' Tr. for So. California*, 144 Cal. App. 3d 222, 232 (1983). Battery, relatedly, requires "(1) defendant intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's person; (2) plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to plaintiff." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526–27(2009) (internal quotation marks omitted).

It is undisputed that none of these four defendants was the principal—that is, the person who performed the physical assault or battery. That was, Fanaro alleges, the inmates who attacked

United States District Court
Northern District of California

him. While some of these defendants may be found liable for failing to protect, that is a different theory than committing the battery or assault. Fanaro's only response is that "the disputed facts and the applicable law as discussed at length above [for Section 1983 actions] go against summary judgment as to Plaintiff's State law claims as well." Dep. Oppo. 12. But a failure-to-protect claim under the Eighth Amendment is a different creature than being liable as a principal for an intentional physical tort. Fanaro has not attempted to show that any of the elements of either tort have been met. And Fanaro does not address the claims against Burnthorne and Arata at all.

**C. Aiding and Abetting**

Fanaro's ninth claim is for aiding and abetting the alleged battery against De Leon, Rosas, Burnthorne, and Arata. TAC ¶¶ 113–23. All of their motions for summary judgment are GRANTED.

Aider and abettor liability "may be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1144 (2005). But "[m]ere knowledge that a tort is being committed and the failure to prevent it does not constitute aiding and abetting." *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1326 (1996).

**i.    De Leon and Rosas**

Viewed in the light most favorable to Fanaro, there is no suggestion in the evidence that De Leon or Rosas provided "substantial assistance or encouragement" to the battery. At most, they failed to stop it. While that failure can lead to liability in the special context of the Eighth Amendment, it cannot lead to aider and abettor liability. *Fiol*, 50 Cal. App. 4th at 1326. Fanaro does not give much argument in response. The strongest potential argument is that, in the particular context of a prison, the inmate defendants could not have committed the battery unless De Leon and Rosas tacitly permitted it to occur, because they arguably heard that it was happening. But Fanaro has no authority transforming that failure into "substantial assistance."

27

*Casey*, 127 Cal. App. 4th at 1144.

### ii. Burnthorne and Arata

There is no record evidence suggesting that any batterer was given assistance or encouragement by Burnthorne or Arata. Fanaro does not contend otherwise.

### D. Conspiracy

Fanaro's eighth claim is for conspiracy to commit the attack against the non-moving inmate defendants and De Leon, Rosas, Burnthorne, and Arata. TAC ¶¶ 109–14. The motions for summary judgment of the latter four are GRANTED.

In California, "[c]ivil conspiracy is not an independent tort. Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort." *Favila v. Katten Muchin Rosenman LLP*, 188 Cal. App. 4th 189, 206 (2010), *as modified on denial of reh'g* (Sept. 22, 2010) (internal quotation marks and citations omitted). It is, instead, "a mechanism for imposing vicarious liability . . . not itself a substantive basis for liability." *Id.* To impose this liability for the alleged battery here, Fanaro needs to show (1) "the formation of a group of two or more persons who have agreed to a common plan or design to commit a tortious act," (2) "actual knowledge that a tort is planned," and (3) "concur[rance] in the tortious scheme with knowledge of its unlawful purpose." *Id.* (internal quotation marks omitted). But "actual knowledge of the planned tort, without more, is insufficient to serve as the basis for a conspiracy claim." *Id.* (internal quotation marks omitted). Rather, "[k]nowledge of the planned tort must be combined with intent to aid in its commission." *Id.* (internal quotation marks omitted).

### i. De Leon and Rosas

Unlike most other state law claims, Fanaro articulates facts in defense of this one. Dep. Oppo. 10–12. He argues that Ramirez testified that the Norteños had "deputies in their pocket" and that it "stands to reason" that the attack was unreported because that deputy was present. *Id.* This deputy, Fanaro asserts, is likely De Leon because he falsely recorded that he performed the cell check. He argues Rosas may be involved because he did not object to this false recording. And both De Leon and Rosas were close by when the loud screams happened.

De Leon and Rosas state that there was no conspiracy and there is no other direct evidence

that would even arguably indicate there was.  De Leon Decl. ¶ 5; Rosas Decl. ¶¶ 4–5.

Circumstantial evidence certainly can support a conspiracy claim, especially at this stage, and I

take Fanaro's point from the hearing that there will rarely be evidence like a confession of

conspiracy.  But, at summary judgment, Fanaro must show a genuine dispute of material fact in

the face of De Leon and Rosas's denials that there was a conspiracy and the lack of evidence

supporting its elements.  Despite the extensive discovery Fanaro has taken, he has produced no

evidence there was anything resembling an "agreement" between De Leon or Rosas and the

inmate defendants to attack Fanaro.

The closest Fanaro comes to circumstantial evidence of a conspiracy is Ramirez's

testimony.  Dep. Oppo 10–12.  First, that testimony, on the record before me, lacks foundation and

is speculative.  *See* Fed. R. Evid. 602.  Fanaro does not reveal how Ramirez came by this

information or what "in their pocket" truly means.[13]  Further, the linkage of that testimony to De

Leon or Rosas is also entirely speculative.  While De Leon's false recordkeeping was

blameworthy, the connection between it and a conspiracy to carry out assault is baseless.  De Leon

and Rosas might be reasonably found to have fallen below the standard set by the Eighth

Amendment.  But there is no evidence they conspired with the inmates to carry out this attack.

### ii.      Burnthorne and Arata

There is no evidence that Burnthorne or Arata conspired to carry out the attack.  Fanaro

does not contend otherwise.

### E.  Intentional Infliction of Emotional Distress

Fanaro's twelfth claim is for intentional infliction of emotional distress ("IIED") against

the non-moving defendants and De Leon, Rosas, Burnthorne, and Arata.  TAC ¶¶ 137–42.  Fanaro

makes no attempt to defend this claim—indeed, he never makes clear the factual basis for his

claims.  He similarly declined to address them at the hearing.  Summary judgment is therefore

appropriate.  *Ramirez*, 560 F.3d at 1026; *Jenkins*, 398 F.3d at 1095 n.4; *Marentes*, 224 F. Supp. 3d

---

[13] The defendants also object that the testimony is hearsay.  County Reply 1; Dep. Reply 1–2.
That may not be prohibitive at summary judgment if the declarant could testify at trial, but
because the foundation of the assertion is so unclear, there is no likelihood of that.  In any case,
their other objections are, as explained, well-taken.

at 919.  The motions for summary judgment are GRANTED.

## VI.    PUNITIVE DAMAGES

Fanaro requests punitive damages.  *See* TAC at 32–33.  The defendants all move for summary judgement on that issue.  Those motions are DENIED with respect to the surviving claims.  It would be the exceptional case in which the underlying claim survives but punitive damages are inappropriate as a matter of law.  Genuine disputes of fact exist about whether De Leon, Rosas, and the Sheriff's Office's alleged violations were "maliciously, wantonly, or oppressively done."  *Dang v. Cross*, 422 F.3d 800, 808 (9th Cir. 2005).

## VII.    MOTIONS TO SEAL

The parties have filed several administrative motions to seal.  *See* Dkt. Nos. 146, 149, 155, 158.  They are in an unusual state.  Even though each party often redacted information designated confidential by other parties, no party has filed the required declaration to maintain them under seal.  *See* Civ. L.R. 79.  Fanaro's requests appear partially copied-and-pasted from the defendants' motions, and so do not make much sense—including by stating that information *he* designated confidential was designated confidential by other parties.  *See* Dkt. No. 158 at 2.  The parties have not uniformly offered highlighted versions of their briefs under seal that show the redactions made in the public ones, as required by Civ. L.R. 79(d)(1)(D).  Fanaro's requests do not try to show specific compelling reasons supported by competent declaration as required, *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016), but conclusorily request that I "weigh the privacy interests of all involved with the public's right to know."

Rather than denying most of the requests outright, the parties are ORDERED to submit a renewed joint motion to seal that follows the guidance here.  First, the parties should redact as little as possible.  Second, I will not seal anything publicly discussed in this Order.  Third, I *will* grant the County Defendants' motions to seal the CSB policies identified because they describe, in sometimes granular detail, how MDF is supposed to operate; exposure of that information could compromise prison security and, in any event, the policies relevant to this motion are discussed here.  Fourth, any request to seal must be supported by a sworn declaration that lays out the specific compelling reasons to seal it.  Fifth, the parties must use a highlighting tool to identify the

portions of documents—especially their briefs—that will be redacted, as the Local Rules require, and submit those newly highlighted documents with the renewed motion.

This joint renewed motion shall be submitted within 30 days. Everything currently sealed may remain that way until I rule on it. That joint motion must include a list of the filings the parties no longer seek to maintain under seal or have redacted. If there are any filings that meet the compelling-reasons standard that any party wishes to remain sealed entirely or redacted, the parties shall include a table that identifies (1) the docket entry of the request, (2) the specific redactions requested, (3) the party that originally submitted the document, (4) the general subject matter of the sealing request, and (5) a citation to the declaration providing competent reasons for the request. The parties can find an example at Dkt. No. 455 of case 3:17-cv-04738-WHO.

## CONCLUSION

The motions for summary judgment are GRANTED IN PART and DENIED IN PART. Summary judgement is granted on (1) all claims against Burnthorne and Arata; (2) all claims against the Supervisor Defendants; (3) claim four (failure to train); (4) claim five (state-created danger); and (5) claims eight (conspiracy), nine (aiding and abetting), ten (battery), eleven (assault), and twelve (IIED) against De Leon and Rosas.

The motions are otherwise denied; specifically, summary judgment is unwarranted for (1) claims one, two, three, and seven based on the Eighth Amendment against De Leon, Rosas, and the Entity Defendants; (2) claim six (negligence) against De Leon and Rosas; and (3) with respect to punitive damages for the surviving claims.

**IT IS SO ORDERED.**

Dated: June 1, 2021

William H. Orrick
United States District Judge